## Case No. 5,057.

### FRANKLIN INS. CO. v. LORD.

[4 Mason, 248.] [1]

Circuit Court, D. Massachusetts. Oct. Term, 1826.

J. T. Austin, for libellants.
A. Peabody, for respondent.

STORY, Circuit Justice. This is a suit in admiralty in personam, upon a respondentia bond and agreement. I do not recite the form of the bond and agreement, but shall advert to such parts only as have been adverted to in the argument. The bond is dated in June, 1825, in the penalty of 20,000 dollars, to secure the re-payment of 10,000 dollars lent "upon the specie, goods, wares, and merchandise, laden or to be laden on board the brig Somers, of Boston, &c. bound from Boston to Copenhagen and St. Petersburg, at and from thence back to a port of discharge in the United States, with the usual liberty to touch and trade for refreshment on the outward and homeward passages." The condition of the bond is, that if the vessel shall do and shall proceed on the voyage, &c. and end it at or before the expiration of six calendar months, the casualties of the seas excepted, "having on board the stipulated amount in value, in specie or merchandise, as the case may be, on the respective passages outward and homeward," and if the said Lord, his heirs, &c. shall and do, within sixty days next after the end of the voyage, pay the 10,000 dollars, with the stipulated interest; or if, during the voyage, a loss of the ship by fire, enemies, men of war, or other casualties, shall unavoidably happen, and the said Lord, his heirs, &c. shall account for and pay a just and proportionable salvage on all said specie, goods, wares, and merchandises, of the said Lord, on board of the said vessel, and on all other goods, specie, wares, and merchandise, which he, his heirs, &c. shall therefrom acquire during said voyage, and shall ship on board the said vessel, and shall not be unavoidably lost as aforesaid, then the obligation to be void. There is a separate memorandum, under the seals of the parties of the same date, indorsed on the back of this bond, upon the special terms of which I do not at present comment, it being sufficient to state, that there is an express stipulation, that the bills of lading of the goods on the voyage, out and home, shall be indorsed to the Franklin Insurance Company, as collateral security for the loan. The brig went upon the voyage, and upon her return voyage was, together with her cargo on board, totally lost by the perils of the seas. It is admitted, that upon the return voyage, goods short of the value of 9,000 dollars were put on board, being the proceeds, though not the whole proceeds, of the outward cargo. The libel demands the payment of the whole 10,000 dollars, upon two grounds; first, that on the outward as well as homeward voyage, there was not on board the stipulated sum of 10,000 dollars on account of the borrower; and, secondly, because there was a breach of the agreement in not indorsing the bill of lading, on either voyage, to the libellants, nor a consignment to them on the homeward voyage, according to the agreement. These are contended to be breaches of the contract, which subject the borrower to the full penalty of the bond; or more properly to that, as security for the re-payment of the 10,000 dollars.

If this were a case pending on the common law side of the court, and proper pleadings were interposed, it would undoubtedly be necessary for the defendant (Lord) to show a strict compliance with the terms of his bond in order to save the forfeiture. Whether in such a court, in a hearing in equity, after the forfeiture was found, the party might not obtain just relief according to the real intention of the parties to the contract, I do not pretend to decide. In a court of equity he would certainly be entitled to such relief, and nothing would be decreed to the libellants but what, ex aequo et bono, they are fairly entitled to. The construction of the meaning and terms of

[1] [Reported by William P. Mason, Esq.]

the contract would be, or at least ought to be, the same in both courts. A court of admiralty, within the sphere of its jurisdiction, acts upon the principles of a court of equity, and administers its remedies accordingly. So far as the claim proceeds upon the non-compliance with the stipulations in the memorandum, it is certainly not a case even at common law for the enforcement of a strict right to the 10,000 dollars. That memorandum constitutes no part of the condition of the bond, not being referred to, or incorporated into it, either in terms or intention. It is an auxiliary, but collateral and independent, agreement. It sounds in covenant, and in covenant only, and the parties can recover, for breaches of it on either side, only to the extent of the damage and injury done to them. A court of common law would give it no farther operation. It is certainly not entitled to a more favorable view in a court of equity. It is very clear in this case, from the answers and evidence, that there was no intentional and fraudulent omission to deliver the bills of lading, or to withhold the consignment. A bill of lading was in fact delivered of the outward cargo, but it was, obviously by mistake, not properly indorsed. There is no question, that it was the intention of all parties, that the libellants should have a complete lien on the cargo during the whole voyage, as security for the loan. In this respect it differs from the case of Busk v. Fearon, 4 East, 319, and the right to enforce this lien would, in the most ample manner, be recognized in a court of admiralty. If there had been a fraud practiced upon the libellants, I, as one, would have gone far to give the most complete relief. And if now it could be shown, that the omission had damnified the libellants, to the extent of that injury, they ought to receive compensation. But no damage has been shown; and indeed, as to the outward cargo, as it was consigned to the supercargo for sale and returns, an actual lien would have been of no serious avail.

Then, as to the other stipulation, that on both voyages there shall be 10,000 dollars on board. It is denied that there was not an entire compliance with the stipulation on the outward voyage. The fact is, that Mr. Lord put on board a cargo to this amount, purchased and belonging to himself. Afterwards, and before the vessel sailed, his son, a young man, without property, and dependent upon him, expressed a desire to have one fourth part interest in the cargo. The father assented, that he might, if he wished. Nothing further was done by the father. But in consequence of this conversation, a clerk in the store, without the knowledge of the father, made out the heading of the invoice, three quarters for the father and one quarter for the son. The bills of lading had been already made out in the name of the father alone, and signed by the master, and were never altered. No charge was made in the books of the father against the son; no security was given by him for the amount, and nothing afterwards occurred between the parties to confirm the bargain. Under these circumstances, which are testified to in a manner which commands belief, I cannot say, that any interest in the cargo passed to the son. He made no payment, gave no security, had no credit on the books, and received no delivery; and the bargain, if it were one, was merely in fieri, and unexecuted; for until payment, or security, or credit given, the father must be deemed the legal owner against all persons. He was the original owner, and purchaser, and shipper, and his interest could not pass by so loose a proceeding as that insisted on. In short, the natural interpretation of it is, that the father intended not so much to part with any property in the shipment, as to allow his son a quarter part of the profits, or charge him with a like proportion of the loss of the voyage. There were some subsequent proceedings after the loss of the vessel, from which it is attempted to be shown, that there was a fraudulent endeavour to suppress the real facts on this point. I do not think it is established in evidence; and if it were, it would not overcome the strength of the other facts, as they have been proved by testimony which I must deem unexceptionable.

We may then pass to the consideration of the remaining part of the case. The defendant has paid into court a sum equal to what he supposes to be the deficiency of value on the return voyage, and the interest; and the only question is, whether the stipulation is absolute, so as to compel him to pay the residue of the 10,000 dollars. The clause in question is found in the condition of the bond. It is argued, that it constitutes an essential part of the condition, on compliance only with which the penalty is saved. If it does not require this interpretation, it is argued, in the next place, that it operates as a warranty, and in this view is equally conclusive upon the party. I am of opinion, that if it does not operate as a condition, it ought not to be held as a warranty from the nature of the stipulation itself, as well as from the effect of the explanatory memorandum. The latter sounds only as a mutual covenant on the same subject matter; and there is no reason to give a broader construction here for any purposes of justice. Then let us see, how it stands on the letter of the bond, as a condition. It is found in one only of the alternative clauses in the condition of the bond; for there are two, one of which looks to the entire completion of the voyage by the parties, the other to the failure of the voyage by some of the accidents provided for. The performance of either alternative saves the bond. The clause, "having on board the stipulated amount in value, &c. on the respective

passages," &c. is found only in the former, and not in the latter. If we take it then in the connexion in which it stands, as a qualification of the first alternative, as the casus foederis has not arisen by the performance of the voyage, it has no bearing upon the defendant. He is saved by the other alternative, a loss having occurred which was absolutely total. To reach the argument of the libellant, it is necessary for the court to insert the same clause in the latter alternative, or to bring it down to the latter as a distinct clause, applicable to both. Whatever reason there might be to do so, for the purpose of adjusting equities between the parties, there is none why a court should studiously aid one party in enforcing a penalty against another, when it did not stand necessarily in the letter of the bond. At common law I am of opinion, that the rigid construction, now contended for, could not and ought not to prevail.

But I am not willing to rest this case upon this mode of reasoning. The contracts of bottomry and respondentia are mercantile contracts of long use and frequent application, and entitled to be expounded, at least in a court of admiralty, in a liberal manner, so as to meet the intentions of the parties, and to subserve the cause of general justice. We may call in aid the laws and usages of other nations to assist in the interpretation, as containing the general sense of the commercial world on the subject. My opinion is, that upon general principles, a contract of respondentia, under circumstances like the present, is to be considered as a contract to risk so much of the amount lent, as shall be covered by the property on board. If goods to the full amount of the loan are on board, the whole loan is at risk; if a less amount, then the risk is pro tanto. I cannot understand it as a rational interpretation of the object of the parties, that unless all is risked, none shall be risked. They may, indeed, so stipulate; but it is not to be inferred from the general terms of a contract, which speaks only of the value intended to be put on board, and kept on board during the voyage. Great inconveniences might otherwise arise. A party hires 10.000 dollars to proceed to a foreign port for sales and returns, stipulating that there shall be this amount on board. Now it may turn out, that the goods come to a falling market, and the proceeds are less than the shipment. Is he, in such a case, to pay the whole respondentia premium for the homeward as well as the outward voyage, although no risk is run upon the latter? Suppose half of it is lost by a peril of the seas on the outward passage, is the condition then to be understood to be broken on his part, and an obligation created to pay the whole amount borrowed, with the interest, because, by the very perils taken by the lender, the property is less than the amount stipulated, for the rest of the voyage out, as well as

home? It appears to me unreasonable to put such a construction upon such contracts, drawn up by mercantile men, and of course dealing in those loose and inaccurate expressions, which the haste and necessities of business excuse, if they do not justify. It appears to me far more just to consider the stipulation, as to value, to be a covenant, that the amount shall be on board during the voyage; and that if it is violated to the prejudice of the lender, then he shall receive compensation. But that as to the amount on board, the risk is to be run, and the maritime interest so far shall be earned. A different course would be as inconsistent with the promotion of good faith, as of public convenience. Suppose the risk is run, and the voyage terminated successfully; is it to be endured, that at the end, the borrower may come forward, and demand a total discharge from all the maritime interest, because at some time during the voyage, there was a small deficiency of the value? It would be immaterial, whether it was a deficiency of ten dollars or five thousand. In either case, if the understanding of the contract is, that the value on board is an absolute condition or warranty, the principle would operate a discharge of the borrower. Such cannot, it appears to me, be the fair interpretation of such a contract; and least of all of one which stipulates, in the event of loss, for a proportionable salvage. The doctrine of the French law conforms to that which I have stated, and I consider it, in the absence of all opposing authority, evidence of the rule generally held by the mercantile world. In a case of this nature, the doctrines supported by such men as Valin, and Pothier, and Emerigon, are entitled to great weight. Emerigon lays down the principle in the following terms: "Where the borrower is unable or unwilling to ship goods to the value of the sum borrowed, the contract, in case of loss, shall be diminished in proportion to the goods shipped, and shall only be valid as to the surplus, for which the borrower shall pay interest according to the custom of the place where it was executed, together with the principal. If the ship arrive safe, there shall be no more due than common interest, and not maritime interest on the excess above the value of the goods shipped." See Hall's Emerig. Mar. Loans, p. 149; 2 Valin, lib. 3, tit. 5, art. 14; 15 Poth. h. t., note 39; Commercial Code of France, bk. 2, tit. 9, art. 329; 2 Emerig. Cont. Grosse, p. 495, c. 6, § 1. I adopt this doctrine, and follow it on the present occasion. Upon these principles, the cause will be referred to a commissioner to ascertain whether anything is due to the libellants more than what has been paid into court. If anything is due, the libellants are entitled to a decree for the amount, with costs; if not, the libel is to be dismissed, without costs, for the defendant. Decree accordingly.